IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TRACY C.,                          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        1:23CV198
                                   )
MARTIN J. O'MALLEY,[1]             )
Commissioner of Social Security,   )
                                   )
                Defendant.         )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Tracy C. ("Plaintiff") brought this action pursuant to Section 205(g) of the

Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a

final decision of the Commissioner of Social Security denying her claim for Disability

Insurance Benefits ("DIB") under Title II of the Act. The Parties have filed cross-motions

for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on September 1, 2017, alleging a

disability onset date of June 15, 2017. (Tr. at 18, 271-73.)[2] Her application was denied initially

_____

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting
Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J.
O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken
to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. §
405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

(Tr. at 154-70, 197-200) and upon reconsideration (Tr. at 171-89, 206-13). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 214-28.) On September 25, 2019, Plaintiff, along with her attorney, attended the subsequent video hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 18, 120-53.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 28-29), and, on January 24, 2020, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

Plaintiff then sought judicial review of the Commissioner's decision in this Court, which ultimately resulted in the case's remand for a new hearing. (See Tr. at 1258-80.) Accordingly, Plaintiff, still represented by an attorney, attended a de novo telephonic hearing on November 28, 2022, at which both Plaintiff and an impartial vocational expert again testified. (Tr. at 1154.) Following the hearing on remand, the ALJ again determined that Plaintiff was not disabled under the Act (Tr. at 1166), and Plaintiff appealed to this Court.[3]

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the

---

[3] In light of the prior remand from District Court, Plaintiff proceeded directly to Federal Court with her Complaint, with no requirement to first seek review by the Appeals Council. See 20 C.F.R. § 404.984(d).

2

ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful

3

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or

[4] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

4

exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since June 15, 2017, her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 1157.) At

_____

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> migraine headaches, chronic back pain, hypertension, obesity, neck pain, carpal tunnel syndrome, asthma, left shoulder pain, status post left hip replacement surgery, and depressive disorder[.]

(Tr. at 1157.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 1157-60.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with further limitations. Specifically, the ALJ found as follows:

> [Plaintiff] can frequently but not constantly reach overhead with both upper extremities due to neck and shoulder pain; she can frequently but not constantly handle and finger with both upper extremities due to carpal tunnel syndrome; she can never climb ladders, ropes, or scaffolds but can frequently climb ramps and stairs and frequently stoop, crouch, balance, and kneel; she can occasionally crawl; she can understand, remember, and carry out instructions for simple routine tasks without a specific production rate requirement (i.e.: assembly line work); she can maintain concentration, persistence, and pace for two hours for two hour segments for completion of simple routine tasks assuming 15 minute morning and afternoon breaks and a 30 minute lunch break; she can interact frequently with supervisors and interact occasionally with coworkers, but can only have incidental contact with the public; and she can adapt to work place changes involving simple work-related decisions.

(Tr. at 1161.) At step four of the analysis, the ALJ determined, based on the testimony of the vocational expert, that Plaintiff's past relevant work as a logistics specialist exceeded the above RFC. (Tr. at 1164.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert

regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 1165-66.)

Plaintiff now challenges the ALJ's RFC assessment in three respects. Specifically, she contends that the ALJ (1) "relied on an incorrect regulatory framework" when making this assessment (Pl.'s Br. [Doc. #11] at 3), (2) failed "to adequately account for the Plaintiff's moderate limitations in maintaining concentration, persistence, or pace" (Pl.'s Br. at 11), and (3) failed to include Plaintiff's need for a cane (Pl.'s Br. at 18). After a thorough review of the record, the Court finds that none of these contentions merit remand.

A.  Regulatory Framework

Plaintiff first argues that the ALJ failed to properly explain the impact of Plaintiff's symptoms on her ability to work. (Pl.'s Br. at 5-11.) In making this challenge, Plaintiff relies on the Fourth Circuit's recent decision in Dowling v. Commissioner of Social Security, 986 F.3d 377 (4th Cir. 2021), and contends that the ALJ committed a reversible error by relying on "an incorrect regulatory framework" when assessing Plaintiff's RFC. (Pl.'s Br. at 3.) In Dowling,

> the ALJ relied on an incorrect regulatory framework when he assessed Appellant's RFC. He did not cite to 20 C.F.R. § 416.945, the section of the Code of Federal Regulations that is titled "Your residual functional capacity" and explains how ALJs should assess a claimant's RFC. Nor did he cite to SSR 96-8p, the 1996 Social Security Ruling that provides guidance on how to properly evaluate an RFC. Finally, the ALJ did not indicate that his RFC assessment was rooted in a function-by-function analysis of how Appellant's impairments impacted her ability to work. Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of a claimant's symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the alleged severity of those

7

> symptoms is supported by the record, is relevant to the RFC evaluation. See 20
> C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should
> consider "limitations that result from the claimant's symptoms, such as pain").
> But an RFC assessment is a separate and distinct inquiry from a symptom
> evaluation, and the ALJ erred by treating them as one and the same.

Id. at 387 (internal brackets omitted). Here, despite Plaintiff's assertions to the contrary, none

of the Dowling concerns apply. First, the ALJ does cite to 20 C.F.R. §§ 404.1545, 404.1520,

and Social Security Ruling ("SSR") 96-8p in explaining how the RFC is determined. (Tr. at

1156.) Specifically, the ALJ explained that:

> Before considering step four of the sequential evaluation process, the
> undersigned must first determine the claimant's residual functional capacity (20
> CFR 404.1520(e)). An individual's residual functional capacity is her ability to
> do physical and mental work activities on a sustained basis despite limitations
> from her impairments. In making this finding, the undersigned must consider
> all of the claimant's impairments, including impairments that are not severe (20
> CFR 404.1520(e) and 404.1545; SSR 96-8p).

(Tr. at 1156.) Although the ALJ does not again cite 20 C.F.R. §§ 404.1545, 404.1520, or SSR

96-8p when making the RFC determination later in the decision, it is not necessary for the

ALJ to cite the regulatory framework multiple times. See, e.g., Hege v. Kijakazi, No.

1:20CV1171, 2022 WL 541324, at *11-12 (M.D.N.C. Feb. 23, 2022) (finding no error under

Dowling where the ALJ included the same language as used here), report and recommendation

adopted, No. 1:20CV1171, 2022 WL 981180 (M.D.N.C. Mar. 31, 2022); Pickett v. Kijakazi,

No. 1:21CV500, 2022 WL 3908862, at *5 (M.D.N.C. Aug. 30, 2022) (same), report and

recommendation adopted, No. 1:21CV500, 2022 WL 4585941 (M.D.N.C. Sept. 29, 2022).

Moreover, in the present case, the RFC discussion encompasses more than an analysis

of Plaintiff's subjective statements. In Dowling, the ALJ's error went beyond a failure to cite

the correct section of the Act; he (1) treated the RFC assessment and the symptom evaluation

8

as "one and the same" and (2) failed to conduct a function-by-function analysis of relevant limitations. Dowling, 986 F.3d at 387. In contrast, the ALJ in the present case identified the correct legal framework for formulating the RFC (Tr. at 1156), and then undertook that analysis by considering Plaintiff's testimony (Tr. at 1161), the medical records (Tr. at 1162), the examination by the consultative examiner (Tr. at 1162), physical therapy notes (Tr. at 1163), MRIs and other imaging (Tr. at 1163), the opinion evidence including the opinions of the consultative examiner after a functional assessment (Tr. at 1163-64), and the opinions of the state agency medical consultants and state agency psychological consultants (Tr. at 1164), as well as Plaintiff's reported activities reflected in the treatment records and the nature of her treatment (Tr. at 1163-64). The ALJ then adopted an RFC taking all of the impairments into account, including the mental impairments (Tr. at 1159-60, 1161, 1164), the restrictions on reaching and handling and fingering in light of her her neck and shoulder pain and carpal tunnel syndrome, and the restrictions to light work and various postural limitations in light of her back, hip, and knee pain. (Tr. at 1161-64.). Notably, Plaintiff does not point to any functions that were relevant or contested that the ALJ failed to address. The only function that she raises relates to her alleged need for a cane, addressed in Section C below. Thus, this is not a case where the "ALJ fail[ed] to assess [Plaintiff's] capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (internal quotation omitted). Instead, it appears that Plaintiff raises only a procedural claim based on the ALJ's failure to cite to the RFC regulatory framework again after including it in the discussion of the

9

Applicable Law. In the circumstances, Plaintiff has not set out any basis for a remand related to the framework used by the ALJ.

Although not set out as a separate claim, Plaintiff's discussion regarding the regulatory framework also includes the contention that "the ALJ erred by failing to consider the Plaintiff's symptoms." (Pl. Br. at 6.) Plaintiff also contends that "nowhere in her decision did the ALJ address the intensity, persistence, and limiting effects of the Plaintiff's symptoms from her severe medical impairments." (Pl.'s Br. at 7.) Plaintiff then quotes several pages of Plaintiff's hearing testimony. (Pl. Br. at 9-11.) To the extent that Plaintiff may be challenging the ALJ's analysis of her symptoms, the ALJ followed the two-step process outlined in the regulatory guidance, as set out by the Fourth Circuit in Arakas v. Commissioner, Social Security, 983 F.3d 83 (4th Cir. 2020):

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4-5. SSR 16-3p recognizes that "symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95 (internal brackets omitted). Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in

order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529:

(i)     [Plaintiff's] daily activities;
(ii)    The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
(v)     Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
(vi)    Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii)   Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, the ALJ outlined and followed this framework (Tr. at 1161), and the ALJ considered the entire case record and explained the reasons for deviating from Plaintiff's statements regarding the impact of her symptoms on her ability to work. The ALJ specifically found that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and the other "evidence of record that documents the extent of the restrictions caused by [her] combination of impairments and her remaining functioning." (Tr. at 1162.) The ALJ then set out the records at length, including the results of multiple consultative examinations and physical

11

examinations reflecting greater functioning than she alleged, as well as the treatment records reflecting her own reports of greater functioning than she alleged at the hearing. (Tr. at 1162-63.) As noted above, with the exception of her alleged need for a cane, which the Court addresses separately in subsection C of this Opinion, Plaintiff fails to identify any specific functional limitations that the ALJ failed to address or that were unaccounted for by the RFC. The Court cannot attempt to guess at what other issues Plaintiff may be attempting to raise.

In sum, Plaintiff's reliance on Dowling and its progeny fails to merit remand in the circumstances of the present case.

B. Concentration, Persistence, and Pace

Plaintiff next argues that the RFC fails to adequately account for Plaintiff's moderate limitations in concentration, persistence, or pace in accordance with Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). In Mascio, the Fourth Circuit explained that, where moderate limitations in concentration, persistence and pace are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (internal quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect

12

> Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted). However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision.
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (internal ellipses omitted) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a plaintiff's moderate limitations in concentration, persistence, and pace in light of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)); see also Sizemore v. Berryhill, 878 F.3d 72, 80-81 (4th Cir. 2017) (rejecting the plaintiff's argument under Mascio where the ALJ relied on the opinion of the state agency psychologist that, notwithstanding moderate limitations in concentration, persistence, and pace, the plaintiff could sustain attention sufficiently to perform simple, routine, repetitive tasks with additional limitations); Shinaberry v. Saul, 952 F.3d 113, 121-22 (4th Cir. 2020) (same, and noting that Mascio "did not impose a categorical rule that requires an ALJ to always include

moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC").

Here, as in <u>Mascio</u>, the ALJ found moderate limitations in concentration, persistence, or pace at step three of the sequential analysis. (Tr. at 1160.) In making that determination, the ALJ specifically found that:

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant testified that she has problems with concentration and can barely watch TV because her focus is so bad. According to the consultative examiner, Clyde Collins, the claimant displayed mild distractibility on mental status examination. She made some errors with mathematical calculations. It was estimated the claimant functioned in the average range of intelligence. (Exhibit 8F, pgs. 3-5).

(Tr. at 1160.) Later in the sequential analysis, the ALJ found that, despite her mental limitations, Plaintiff could "understand, remember, and carry out instructions for simple routine tasks without a specific production rate requirement (i.e.: assembly line work)." (Tr. at 1161.) The ALJ further determined that Plaintiff could "maintain concentration, persistence, and pace . . . for two hour segments for completion of simple routine tasks assuming 15 minute morning and afternoon breaks and a 30 minute lunch," and could "adapt to work place changes involving simple work-related decisions." (Tr. at 1161.)

Despite these extensive restrictions, Plaintiff argues that the ALJ failed to include "any discussion or analysis as to *how* the Plaintiff can *stay on task* for a sustained period of time." (Pl.'s Br. at 12.) However, the decision in this case reflects that the ALJ did include discussion and analysis of Plaintiff's mental limitations at length, and in reaching her conclusions she relied on the consultative examinations, the functioning reflected in the treatment records, Plaintiff's conservative mental health treatment, and the opinion evidence. (Tr. at 1160, 1163-

14

64.)  The ALJ specifically found the state agency psychologists' opinions persuasive and relied upon them when crafting Plaintiff's mental RFC assessment.  (Tr. at 1164.)  Both state agency psychologists found that Plaintiff retained adequate attention for the completion of simple tasks despite her moderate limitations in concentration, persistence, and pace.  (Tr. at 166, 167, 186.)  In their evaluations, Dr. Nancy Herrera and Dr. Brett Fox agreed that Plaintiff was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, but they also agreed that she was not significantly limited in her ability to carry out short and simple instructions, in her ability to sustain an ordinary routine, in her ability to complete a normal workday and workweek, and in her ability to perform at a consistent pace.  (Tr. at 166, 185-86.)  Dr. Herrera added that Plaintiff "[c]an retain attention to complete a simple task" (Tr. at 166), and Dr. Fox concluded that Plaintiff was "capable of completing simple tasks in a less demanding work setting" (Tr. at 187).  The ALJ included these restrictions in the RFC, and the ALJ's discussion is sufficient to explain the basis for the conclusions.  See Sizemore, 878 F.3d at 80-81 (finding that the ALJ's reliance on the opinion of the state agency psychologist formed a sufficient basis for the claimant's mental RFC).

Plaintiff also contends that "the terms used by the ALJ in the RFC are legally insufficient, inadequate, and frustrate a meaningful judicial review."  (Pl.'s Br. at 13.)  In particular, she contends that the ALJ failed to sufficiently define the RFC with respect to the limitation to work "without a specific production rate requirement." (Pl.'s Br. at 17.)  As Plaintiff correctly notes, in Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019), the Fourth Circuit found that an RFC limitation prohibiting work "requiring a production rate or demand

15

pace" did not provide "enough information to understand what those terms mean." Accordingly, the Fourth Circuit in Thomas held that, "[w]ithout further explanation," it would not determine "whether the RFC finding—particularly the portion restricting Thomas to jobs that do not require a 'production rate' or 'demand pace'"—properly account[ed] for Thomas's moderate limitations in concentration, persistence, and pace." Id. at 312 n.5; see also Perry v. Berryhill, 765 F. App'x 869 (4th Cir. 2019) (finding that the failure to define the term "non-production oriented work setting" precluded meaningful review).

However, Defendant argues that the limitations in the present case align with another Fourth Circuit decision, Sizemore, 878 F.3d at 80-81, in which the Court held that substantial evidence supported a limitation to "low stress non-production jobs with no public contact." In Perry, the Fourth Circuit noted that "the ALJ in Sizemore provided additional context, explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or 'public contact,' to account for moderate limitations in concentration, persistence and pace. Those descriptors helped to explain the restriction intended by the ALJ, and allowed us to evaluate whether that restriction adequately accounted for the claimant's limitations." Perry, 765 F. App'x at 872 n.1 (internal citation omitted); see also Jones v. Saul, No. 8:18-2586-BHH, 2020 WL 1316532, at *5 (D.S.C. Mar. 20, 2020) ("[T]he ALJ adequately accounted for Plaintiff's moderate limitations in concentration, persistence, and pace by explaining how long and under what conditions Plaintiff could focus and maintain simple tasks, and by including restrictions related to Plaintiff's ability to change activities or work settings and work in proximity to others without distraction."); Gravel v. Kijakazi, No. 5:21-CV-178-KDB, 2022 WL 3008437, at *3 (W.D.N.C. July 28, 2022) ("[T]he use of the term

16

'non-production workplace setting' is not so indefinite in this context that the case must be remanded. The Court understands the phrase simply to refer to jobs which do not involve participating in the production of goods, such as on an assembly line."); Lamm v. Kijakazi, No. 5:22-CV-138-D, 2023 WL 6167151, at *7 (E.D.N.C Aug. 18, 2023) ("Here, the ALJ adds context through descriptors that are similar to those in Sizemore. For example, the ALJ limits Plaintiff to 'no fast-paced production,' in the context of a 'in a low-stress setting.'").

Here, as in Sizemore, the ALJ's RFC finding adequately accounted for Plaintiff's moderate limitations in concentration, persistence, and pace, and included sufficient additional context to explain the restrictions intended by the ALJ. In restricting Plaintiff to work "without a specific production rate requirement," the ALJ provided an example, "i.e.: assembly line work." (Tr. at 1161.) This example was provided to the Vocational Expert (Tr. at 1194) and provides additional explanation and context. See, e.g., Nelson v. Saul, No. 4:18-CV-163-D, 2019 WL 4748028, at *5 (E.D.N.C. Aug. 29, 2019) ("The present case is distinguishable from Perry and Thomas because here, the ALJ offered an explanation for what he meant by 'no production-rate or paced-rate work'—the ALJ wrote in a parenthetical, 'such as would be done on an assembly line.'"), report and recommendation adopted, No. 4:18-CV-163-D, 2019 WL 4747048 (E.D.N.C. Sept. 27, 2019). In addition, the ALJ limited Plaintiff to work involving (1) only simple, routine tasks; (2) only occasional interaction with coworkers; (3) only incidental contact with the public; and (4) only adapting to workplace changes that involve simple work-related decisions. (Tr. at 1161.) The ALJ also specifically found Plaintiff capable of maintaining concentration, persistence, and pace for 2-hour increments throughout the workday. (Tr. at 1161.) See Ross v. Berryhill, 1:17CV1145, 2019 WL 1430129, at *1

17

(M.D.N.C. Mar. 29, 2019) ("As in <u>Sizemore</u>, and unlike in <u>Perry</u>, the ALJ here provided the necessary 'descriptors,' limiting Plaintiff to 'a low stress, low production environment with no rigid quota and occasional exposure to people.' Accordingly, <u>Perry</u> does not justify remand in this action." (internal citation to record omitted)).

As noted above, in reaching this conclusion regarding Plaintiff's RFC in this case, the ALJ considered the results of Plaintiff's mental status examination (Tr. at 1160), Plaintiff's reports of her activities and abilities as reflected in the consultative examination and throughout the treatment records (Tr. at 1161-64), her conservative mental health treatment (Tr. at 1164), and the opinion evidence (Tr. at 1164). This discussion, the context given, and the additional limitations set out in the RFC all provide sufficient explanation for the RFC limitations related to concentration, persistence, and pace. <u>See</u> <u>Sizemore</u>, 878 F.3d at 80-81. Overall, the Court concludes that the RFC is understandable, that the ALJ provided an explanation and review of the record to support that RFC, that the multiple RFC restrictions address Plaintiff's limitations in concentration, persistence, and pace, that these conclusions are supported by substantial evidence, and that Plaintiff has not pointed to any error that would require remand.

C. <u>Cane Use</u>

Finally, Plaintiff contends that "[t]he ALJ erred by failing to include in the RFC the Plaintiff's need to use a cane." (Pl.'s Br. at 18.) She further asserts that "[t]he error was not harmless because such a limitation would preclude light exertion work and the Plaintiff grids out at a sedentary exertion RFC." (Pl.'s Br. at 18) (emphasis excluded).

"The requirement to use a hand-held assistive device may . . . impact [a claimant's] functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.00(J)(4) (2017). Accordingly, an ALJ must consider the impact of a "medically required" hand-held assistive device on a claimant's RFC. See McLaughlin v. Colvin, No. 1:12-CV-621, 2014 WL 12573323, at *2 (M.D.N.C. July 25, 2014); Social Security Ruling 96-9p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work --Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p"). SSR 96-9p explains the impact of an assistive device on an RFC for sedentary work, and courts within this Circuit have applied this ruling to the light occupational base as well. See, e.g., Timmons v. Colvin, No. 3:12CV609, 2013 WL 4775131, at *8 (W.D.N.C. Sept. 5, 2013). Notably, SSR 96-9p provides the following guidance:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The [ALJ] must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7.

Here, Plaintiff testified at her November 2022 hearing that she requires a cane for walking as well as to help her sit down and rise from a seated position. (Tr. at 1182.) However, she cites no evidence that an assistive device was medically required. Instead, Plaintiff cites

19

treatment notes documenting her cane usage during recovery from a left hip replacement in January 2022. (Pl.'s Br. at 20-21) (citing Tr. at 1699, 1752, 1792, 1827-31, 1882, 1889).

Notably, the ALJ in her decision acknowledged Plaintiff's testimony regarding her cane usage in 2022. (Tr. at 1161.) However, in considering the extent of Plaintiff's limitations, the ALJ first recounted physical examinations and other objective findings from prior to 2022, reflecting that Plaintiff could "walk without difficulty" and had "normal ability to walk." (Tr. at 1162-64.)[6] With respect to Plaintiff's condition in the weeks after her January 2022 surgery, the ALJ recounted as follows:

> On January 28, 2022, [Plaintiff] underwent a left hip replacement surgery. . . . On April 14, 2022, [Plaintiff] reported that her hip felt "a whole lot better." She was undergoing physical therapy and reported she was staying active by doing gardening and yard work. In May 2022, [Plaintiff] complained to her physical therapist of left hip soreness after episodes of long driving and lots of standing and walking. She reported that she recently had bilateral back injections and felt "really good." Throughout 2022 and after [Plaintiff's] left hip replacement surgery, she cared for three dogs.

(Tr. at 1163) (internal citations to record omitted). Later in her decision, the ALJ again noted Plaintiff's post-surgical activity level, this time as part of her rationale for adopting RFC restrictions consistent with those found by the state agency medical consultants, despite those findings predating the surgery. (See Tr. at 1164.) Specifically, the ALJ noted that "[e]ven after [Plaintiff's] left hip replacement surgery, [Plaintiff] gardened, did yard work, cared for three dogs, and did 'lots of standing and walking.'" (Tr. at 1164.)

---

[6] Treatment notes from 2017 and 2018 reflected normal ambulation. (Tr. at 1162). Several of Plaintiff's conditions, including her back, hip, and knee impairments, became increasingly symptomatic in the following years, requiring steroid injections, physical therapy, and ultimately hip surgery in 2022, but Plaintiff points to no evidence that she required a cane prior to 2022.

20

The medical record supports this summary and analysis. Specifically, the record reflects that Plaintiff received a cane immediately prior to her surgery in January 2022 (Tr. at 1641-42), and that after her surgery on January 25, 2022, she used a front-wheeled walker for a few days, as reflected on a January 28, 2022 treatment note reflecting that she was "properly ambulating with FWW." (Tr. at 1639, 1641, 1726.) Physical therapy records a month later, on February 28, 2022, reflect that she was engaging in "long distance walking" in the yard and "staying active all the time." (Tr. at 1758.) Records from March 2022 reflect that she was walking with a walking stick. (Tr. at 1749.) A physical therapy note from March 1, 2022, reflects that she reported "staying active all the time by moving around at home with and without cane." (Tr. at 1744, 1753.) Notably, by March 28, 2022, just two months after her surgery, she arrived at an appointment with a cane but reported to her providers that she was walking without a cane at home, and only had "mild pain occasionally." (Tr. at 1726, 1882.) At the appointment on March 28, 2022, she showed "significant improvements." (Tr. at 1728.) A few days later, on April 5, 2022, she again noted that she was not using a cane or assistive device in her house, and just brought it for use outdoors. (Tr. at 1699.) A few weeks later, by April 15, 2024, she reported that "her hip feels a whole lot stronger," and she was "staying active by doing gardening and yard work." (Tr. at 1694.) At a follow-up with her surgeon on April 22, 2024, she reported that she was "[f]eeling fine" and was "doing well," with examination reflecting "good range of motion good strength she is neurovascularly intact." (Tr. at 1854.) A few days later, she reported to her physical therapist that her surgeon is "very pleased with her progress" with no limping when she walked in the clinic. (Tr. at 1944.) In May 2022, she still used her cane when going out to appointments (Tr. at 1827, 1831), but she reported that she was doing

"long driving and lots of standing and walking" on the weekends (Tr. at 1942).  On May 17, 2022, she reported that she was "on her feet . . . almost the whole day" on Friday and Saturday, and she "even rode a bike" on Saturday.  (Tr. at 1938-39.)  On May 31, 2022, four months after her surgery, she reported "improved tolerance for activities and hobbies, including riding on the back of the motorcycle" and she was walking without an assistive device and reported 0/10 pain.  (Tr. at 1882, 1928-29, 1930-31.)  On June 7, 2024, she reported minor discomfort "due to [a] lot of walking, stairs and standing this past weekend."  (Tr. at 1924.)  The next month, in July 2022, she reported some soreness "due to long flights and busy week with grandchildren" being "up and about, lots of stairs and walking" on vacation.  (Tr. at 1909.) She had met her goal of being a "community level ambulator" and was still working on squatting and uneven surfaces.  (Tr. at 1910.)  By August 2022, she reported that she was doing "much better" and only used a cane "occasionally if her muscles are very fatigued."  She reported that she was able to do more yard work and household chores, and was strong enough to ride her motorcycle.  (Tr. at 1882.)  At an allergy appointment in August 2022, she was observed to have a normal gait.  (Tr. at 1982.)

The ALJ summarized and relied upon these records, noting Plaintiff's gardening and yard work and lots of standing and walking in concluding that Plaintiff's testimony was not consistent with the functioning reflected in the medical records and that the record did not reflect a need for an assistive device for a condition that was expected to last for at least 12 continuous months.  (Tr. at 1158, 1163, 1164.)  In short, a review of the record and the administrative decision reveals that the ALJ considered Plaintiff's cane use in accordance with the regulations.  She considered Plaintiff's testimony, the transient nature of the cane's medical

necessity, the objective evidence, and Plaintiff's contemporaneous accounts of her activities when omitting a hand-held assistive device from the RFC assessment. Because substantial evidence supports this determination, the Court finds no basis for remand.

Ultimately, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained her decision, and clearly explained the reasons for her determination. That determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion to Reverse the Decision of the Commissioner should therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #11] is DENIED, that Defendant's Dispositive Brief [Doc. #17] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 26th day of March, 2024.

    /s/ Joi Elizabeth Peake    
United States Magistrate Judge
